# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**R.S., et al.,**

      Plaintiffs,

      v.

**CHARMAINE WEST, et al.,**

      Defendants.

CASE NO. 3:20 CV 2791

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Currently pending before the Court in this 42 U.S.C. § 1983 action is Defendants Charmaine West, Susan Hickey, Rebecca Von Sacken, and Courtney Mowery's Motion for Summary Judgment. (Doc. 109). Plaintiffs oppose the Motion (Doc. 113), and Defendants reply (Doc. 121). Also pending are Plaintiffs' Motions to Strike (Doc. 114) and Conduct Additional Discovery (Doc. 115). Defendants oppose these Motions (Doc. 119) and Plaintiffs reply (Doc. 120). Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth below, the Court DENIES Plaintiffs' Motions to Strike and to Conduct Additional Discovery, and GRANTS Defendants' Motion for Summary Judgment.

## BACKGROUND

This case arises out of horrific and life-altering abuse that Plaintiffs suffered while in the care of Anthony and Alisa (sometimes "Lisa") Haynes following placement by the Lucas County Children Services ("LCCS") and the Lucas County Juvenile Court. The Court summarizes only the information necessary and relevant to the pending motions below.

Factual Background

Plaintiffs lived with their mother Victoria Hubbard (also "Victoria Bailey") and her husband in 2014. In early July 2014, Lucas County Children's Services received a referral that an infant sibling of Plaintiffs had been abused or neglected. (Ryan Parker Aff., Doc. 109-2, at ¶¶ 2-3). Parker, a LCCS Night Intake Case Worker, investigated and met with Victoria Hubbard, Plaintiffs' and the infant's mother, at the hospital. *Id.* at ¶¶ 4-5. Hubbard identified her pastor and his wife (Anthony and Alisa Haynes) as individuals the children could stay with temporarily. *Id.* at ¶ 7. Parker discussed with his supervisor that the Haynes family "already had a case worker in the home and had recently been fingerprinted". *Id.* at ¶ 9.[1] Parker consulted with his supervisor, Ms. Hoffman:

> Ms. Hoffman instructed me to ensure criminal records checks were completed and to check the Statewide Automated Child Welfare Information System (SACWIS) to see if the family had any LCCS involvement. I was also to check and ensure a case worker had been in the home within the last month. I followed up on Ms. Hoffman's direction and found the records checks with no disqualifying history. I also ran a records check on the Haynes'[s] 19 year old son and found no results. I checked SACWIS records for the Haynes['s] and found no involvement for Mr. Haynes or Mrs. Haynes as a substantiated perpetrator of abuse or neglect. I saw the case note that a case worker had been in the home within the past month.

*Id.* at ¶ 9; *see also* Doc. 109-10, at 9 (Parker Activity Log). After doing so, Parker entered his case notes into SACWIS[2] and then transferred the case "to the assessment's department." *Id.* at ¶ 10.

_____

1. According to Parker, "Ms. Haynes indicated that she had been working with LCCS on another case and that a worker had been out to their home recently. Ms. Haynes indicated they had already been fingerprinted and cleared by LCCS staff to care for another child in their home." (Parker Aff., Doc. 109-2, at ¶ 8). This child was not related to Plaintiffs. (Temple Aff., Doc. 109-3, at ¶ 2).
2. SACWIS is a "statewide information system to keep and maintain case information on child welfare cases." (Cully Aff., Doc. 109-4, at ¶ 4).

Defendant Rebecca Von Sacken was the LCCS Assessment Case Worker assigned to Plaintiffs' case. (Doc. 106-1, at 52). Von Sacken was involved with Plaintiffs' case for approximately three weeks in July 2014, starting with an emergency placement custody meeting on July 3 and ending the week of July 21. *Id.* at 55-65. She completed the "preliminary home study" and then transferred the case to another LCCS employee, Susan Hickey. *Id.* at 69-70.

Von Sacken started the preliminary home study with the "Home Study for Placement of Children" document, and her name appears on it as "Caseworker." (Doc. 109-9, at 30-38). To complete this portion of the study, Von Sacken testified, "you are supposed to see the home, gather information about the people who live in the home[,] . . . do police checks, sex offender registry checks, [and] SACWIS history check[s]." (Doc. 106-1, at 70). Von Sacken testified she did these checks. *Id.* at 71-73. She also testified that the SACWIS history for an individual "pre-populates" into the home study form. *Id.* at 74-75. "If there was something that was populated and we had questions about it, we would definitely talk to [our] managers[.]" *Id.* at 75. Certain convictions and SACWIS-documented information  could exclude someone from being a placement. *Id.* at 75-76. As to information from SACWIS, Von Sacken testified:

> A:   And then as far as SACWIS, we would look at what the allegations were and what the disposition of those allegations were and what your role was in that investigation.

> Q:   Okay. And then, was there any type of policy on that? Like there were certain things that were excluded if they popped up on SACWIS?

> A:   I believe they just looked at each one case-by-case and what the all[e]gations were, what their role was. Like, you can't just broadband exclude everybody. So I think you have to look at what the allegations were, what their role was, and what the disposition of that was.

> Q:   Okay. And then was that the policy? The policy was we would look at them and then make a decision on it?

> A:  I can't say it as a policy. I'm not for sure if that was a policy, but that's what we did. We talked about it with our manager, and then we talked – the manager would talk to our supervisor, and our supervisor would talk to the manager if there was anything concerning that popped up on there.

> Q:  Okay.

> A:  And then the court would obviously be the ultimate decider on placement.

> Q:  Right. If you gave the court the information about the different, I guess, issues that may have popped up on a police check or a background check?

> A:  It's all – it's pre-populated, and then you attach the whole report to the home study.

*Id.* at 76-77.

The "Summary of Referrals" section of the home study document contains the following:

**SUMMARY OF REFERRALS** (*attach incident history print-out or record*)

5/1999 Alisa was listed as the caretaker on an Indicated Sexual Abuse referral.

5/2000 Alisa was listed as the caretaker on a Substantiated Sexual Abuse referral.

10/2000 Alisa was listed as OIC on an Unsubstantiated Neglect referral.

10/2003 Alisa was listed as the caretaker on a Substantiated Sexual Abuse referral.

4/2004 Anthony was listed as the AP and Alisa was listed as the caretaker on an Unsubstantiated Sexual abuse referral.

(Doc. 109-9, at 31).[3] Von Sacken testified she specifically recalled discussing the SACWIS information about the Hayneses with her supervisor. (Doc. 106-1, at 77-82). When asked what her understanding of Anthony and Alisa Haynes's history in the SACWIS system, she recalled:

> I believe that they had some referrals with the – our agency that were either they were not listed as alleged perpetrator, if they were substantiated, or if they – I don't believe they had anything that sub – where they were listed as alleged perpetrators where they were – that were substantiated, if that makes sense. So

---

3. It is clear that "AP" stands for "Alleged Perpetrator." Neither party identifies what "OIC" means.

4

there were no referrals in our system that said that they were alleged perpetrator and it was substantiated.

*Id.* at 82; *see also id.* at 132 ("I just want to reiterate that they had nothing – the Haynes adults had no substantiated cases where they were listed as alleged perpetrators. So – that none of that would have excluded – any of their SACWIS history was not excludable based off of that. They were not listed as alleged perpetrators on a substantiated or indicated . . . I'll say substantiated case.").

Von Sacken did not do any further independent investigation into the prior allegations contained in the SACWIS system. *Id.* at 106. Rather, she described the process as: "We read the - - what was contained in the intake and then reviewed, like, the dispositional narrative or the closed - - case-closing narrative or the narrative when the case was finalized. . . . Those investigations were completed by somebody else." *Id.* at 106. In responses to a similar question asked later about whether she did "anything in terms of digging around in SACWIS or contacting anybody identified in those previous hits in SACWIS related to the Hayneses" or "call any of the . . . alleged victims or anything else or talk to anybody involved in those cases that popped up in the SACWIS system for the Hayneses", she explained:

> No. I reviewed the allegations, reviewed the dispositions and what happened in the case, and I did not investigate those cases. So that's - - that was the expectation. So that's what I did. . . . We don't go back and contact previous victims of things that were already investigated . . .. It was unsubstantiated. They had a chance to discuss that with the investigator and higher-ups if they disagreed with that disposition.

*Id.* at 129-30. The intake forms for Anthony and Alisa Haynes show that neither was the alleged perpetrator of abuse on a claim found to be substantiated. *See* Docs. 109-11 (Alisa) and 109-12 (Anthony). Specifically, with respect to the incidents listed in the "summary of referrals" section of the home study document completed by Von Sacken: (1) in May 1999, Alisa was listed as a

"caretaker" on an intake form describing sexual abuse of a child by a different adult man; this case was disposed of as an "indicated" sexual abuse claim. (Doc. 109-11, at 12); (2) in May 2000, Alisa was again listed as a "caretaker" on an intake form describing sexual abuse by the same adult man who was identified as the "alleged perpetrator"; this case was determined to be "substantiated", *id.* at 8; (3) In October 2000, Alisa was listed in the role of "exception" on a case alleging neglect by the same adult man (as to his two children) who was identified as the "alleged perpetrator"; this case was found "unsubstantiated", *id.* at 5; (4) in October 2003, Alisa was listed as a "caretaker" on an intake form describing child sexual abuse by the same adult male, again identified as the alleged perpetrator; the case was determined to be "substantiated"; and (5) in April 2004, Anthony was listed as the alleged perpetrator on a sexual abuse claim involving a nine year old girl (his stepdaughter) and Alisa was listed as the "caretaker"; the case was disposed of as "unsubstantiated" in May 2004 (Doc. 109-12, at 1).[4]

Von Sacken further recalled reviewing the Hayneses criminal history as part of the preliminary home study, and recalled that it contained "[n]othing that would exclude them from placement with the children" but she did not specifically recall whether there was anything in that criminal history. *Id.* at 130-31. She also testified that she had no knowledge of Plaintiffs suffering abuse or neglect in the Haynes home. *Id.* at 52, 116-20.

Susan Hickey was the LCCS Department of Family Services ("DFS") case worker assigned when Plaintiffs were placed with the Haynes family in July 2014. (Doc. 107-1, at 16-

---

4. Under Ohio law, a "[s]ubstantiated report" is a disposition "in which there is an admission of child abuse or neglect by the person(s) responsible; an adjudication of child abuse or neglect; or other forms of confirmation deemed valid by the [investigating agency]." *Kyser v. Summit Cnty. Children's Servs.*, 175 Ohio St. 3d 392, 399 (Ohio 2004) (quoting Ohio Admin. Code § 5101:2-1-01(B)(313). An 'Unsubstantiated report' means the report disposition in which the assessment/investigation determined no occurrence of child abuse or neglect." *In re A.Z.*, 2022-Ohio-3943 (Ohio Ct. App. 2022) (quoting Ohio Admin. Code. § 5101:2-1-01(B)(341)).

18). Hickey testified that generally, when a case was referred from an assessment caseworker to the DFS caseworker, the two would hold a transfer conference, set up a time to meet with the family together, and then set up a case plan. *Id.* at 19-20. When Hickey took over the case from Von Sacken, they held a transfer conference. *Id.* at 17-18. She also visited the Haynes home "within a couple of days" of getting the case. *Id.* at 31-32. Hickey's role was "[t]o get the children into case plan services, [and] to monitor them until [they] went to court and a permanent plan was made." *Id.* at 24-25. It was her responsibility to establish a case plan; recommendations come from the assessment case worker, but it was ultimately the DFS case worker's responsibility. *Id.* at 32.

Hickey did not independently investigate Anthony or Alisa Haynes's background, but that was typically the job of the assessment caseworker. *Id.* at 33-34. When asked if she "ever double-check[ed] that, Hickey said "I just saw what she had - - what was written on the home study." *Id.* at 34. She reviewed those sections when she completed the home study "but nothing must have stood out to me." *Id.* at 34-35. She said she "kn[ew] that they were caretakers in regards to, you know, some history" but "d[idn't] know that they were considered perpetrators or anything like that in regards to it." *Id.* at 34.

> Q:     Okay. And then did you look at either Anthony Haynes' or Lisa Haynes' background with regard to the placement?
>
> A:     That was already done when I got the case.
>
> Q:     Okay. Do you know who did that?
>
> A:     Rebecca – well, you know what? I can't say that for sure because I don't know if it came in on nights or you know, on the weekend. If that happened, then it would have been someone from there.
>
> Q:     But if not, it's usually the assessment caseworker?
>
> A:     Yes.

7

Q:      And what are they supposed to do?

A:      Run a background check, fingerprints, look at them in our system to see if
they have any history.

Q:      When you say "our system," do you mean the SACWIS system?

A:      Yes.

Q:      Okay. Did you ever double-check that?

A:      I just saw what she had - - what was written on the home study.

*Id.* at 33-34.

Hickey completed the home study started by Von Sacken; she then gave it to her supervisor, who reviewed and signed it. *Id.* at 36. She had monthly visits with the Haynes family and Plaintiffs until the Hayneses obtained legal custody in February 2015. (Doc. 107-1, at 16-20, 36, 41-44.

Neither Hickey nor Von Sacken (nor anyone else) informed Hubbard of the SACWIS or criminal history information obtained for the Hayneses. (Doc. 117, at 2). If anyone had shared this information, Hubbard avers she would not have consented to placement with the Haynes household. *Id.*

There is no dispute that Plaintiffs suffered terrible abuse while in the Haynes home.

In the background section of their brief, Plaintiffs paste two records, seemingly from LCCS, and state the documents "were produced by Defendants in discovery." (Doc. 113, at 4-5). These records, based on their similarity to other records provided and cited by Defendants, appear to be from LCCS employee activity logs.[5] The first record, which follows the intake

---

5. Defendants rely on and attach the Activity Log Reports of Fraber, West, Mowery, Hickey, Von Sacken, and Parker in support of their Motion for Summary Judgment. (Docs. 109-5

report regarding the April 2004 sexual abuse allegations against Anthony, contains no date or author name; it describes various background information and possibly contains interview notes with Alisha and Anthony, but it is not entirely clear. *Id.* at 4. It also contains a note that Alisha went to jail for fourteen days in 2000. *Id.* The second record, again not specifically identified but merely pasted into the brief, is dated May 23, 2004, authored by a Melissa Coburn, and identified as a note regarding case category: Assess/Invest (presumably short for "investigate"). *Id.* at 5. It states that an assistant Lucas County Prosecutor left a message to return a call and then the following note: "mom served some jail-felony-false identification couple years ago-idenify [sic]." *Id.*

Procedural Background

This case was originally filed in December 2020. (Doc. 1). Following the filing of an Amended Complaint (Doc. 49), this Court granted Defendants' Motion for Judgment on the Pleadings. (Doc. 70). The Sixth Circuit reversed as to this Court's determination on the Fourteenth Amendment substantive due process claim against Von Sacken, and, because this Court had not reached the claims against West, Mowery, or Hickey, the Sixth Circuit remanded for "individualized analysis" as to these Defendants. (Doc. 76); *R.S. v. Lucas County Children Servs., et al.*, 2022 WL 17730531, at \*6 (6th Cir.). Following remand, with Court leave, Plaintiffs filed the now-operative Second Amended Complaint on March 17, 2023. (Doc. 80).[6] Following a period of delay that defense counsel attests was due in large part to Plaintiffs' counsel's lack of responsiveness (Ranazzi Aff., Doc. 119-1, at ¶ 4), an agreed protective order

through 109-9). These total 208 pages and do not appear to the Court to contain the documents pasted in the brief, so the Court has no more information regarding them.

6. The Second Amended Complaint added additional defendants. *See* Doc. 80. However, Plaintiffs failed to serve any of these defendants with the Amended Complaint, and, following the issuance of a show cause order to which Plaintiffs did not respond, the Court dismissed the claims against these additional defendants without prejudice in July 2023. (Docs. 84, 85).

was entered in June 2023. (Doc. 83). Plaintiffs' counsel then reviewed documents prepared by LCCS in September 2023 (*id.*), and these were turned over as part of Defendants' initial disclosures in October 2023. (*id.*; Doc. 120, at 5).

In a September 2023 status conference, the Court set a discovery deadline of June 14, 2024, and dispositive motion deadline of July 31, 2024. The docket entry noted that no extensions would be granted on these deadlines. Defendants took depositions of Plaintiffs and their mother in November and December 2023. Plaintiffs took depositions of the four Defendants in March 2024. On May 31, 2024 (two weeks before the discovery deadline), Plaintiffs served Defendants with their first set of interrogatories and requests for production. (Doc. 114-1). Defendants responded on June 28, 2024. *Id.* at 27.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to

10

defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

**DISCUSSION**

Defendants move for summary judgment on the remaining 42 U.S.C. § 1983 substantive due process claim against West, Mowery, Von Sacken, and Hickey, arguing each is entitled to qualified immunity (and summary judgment). Plaintiffs respond that issues of material fact remain, particularly as to Von Sacken and Hickey. (Doc. 113). Plaintiffs further assert that they have separately filed a motion regarding the completeness of discovery. *Id.* at 13 n.1. In reply, Defendants contend Plaintiffs have abandoned their claims as to West and Mowery and have not shown questions of material fact as to Von Sacken or Hickey's entitlement to qualified immunity. (Doc. 121). For the reasons set forth below, the Court grants Defendants' motion for summary judgment.

<u>Motion to Strike / Motion to Conduct Additional Discovery</u>

The Court begins with the pending procedural motions. After requesting and receiving three extensions of time to respond to Defendants' Motion for Summary Judgment, Plaintiffs filed their opposition brief. One day later, Plaintiffs filed the currently-pending Motions to Strike (Doc. 114) and to Conduct Additional Discovery (Doc. 115).

*Motion to Strike*

In their first motion, Plaintiffs seek to strike the Affidavits of Faber, Parker, and Temple, which Defendants rely upon in moving for summary judgment, arguing Defendants did not properly disclose these individuals as witnesses in their initial disclosures or in written discovery.

11

(Doc. 114). Defendants respond that they *did* disclose these individuals, in emailed supplemental witness disclosures, and claim that any alleged disclosure noncompliance was harmless because Plaintiffs were  aware of these witnesses based on other discovery in this case and the prior juvenile court custody proceedings. (Doc. 119). Defendants further assert that all the documents they rely upon in support of summary judgment were turned over to Plaintiffs in 2023. *Id.* at 5. Plaintiffs do not dispute this latter assertion (Doc. 120, at 5).

It appears undisputed that Defendants' initial disclosures did not identify these three individuals by name. But it also appears undisputed that Defendants provided these names in emailed supplemental witness lists in early 2024, and that these three individuals were referenced by Plaintiffs and their mother in their late 2023 depositions.

Rule 26(a)(1)(A)(i) provides that initial disclosures must include: "(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment". Rule 26(e)(1)(A) requires a party to supplement its disclosures "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing". And Rule 37(a)(3)(A) provides: "If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." "The distinct purpose of the initial disclosure is to alert the opponent to the existence of a witness whose testimony may be helpful to the disclosing party." *Harris v. Advance Am. Cash Advance Ctrs., Inc.*, 288 F.R.D. 170, 171 (S.D. Ohio 2012).

It appears undisputed that these witnesses were not disclosed in Defendants' initial disclosures. It is also undisputed that Defendants did not specifically identify any of the three in response to Plaintiffs' discovery request to identify "any and all persons known to you who possess or claim to possess knowledge of any facts concerning any allegation in the Complaint". (Doc. 114-1, at 5-6). But Defendants' response to this interrogatory states "[t]his information has been previously provided in both the initial disclosures, numerous correspondence providing names of potential witnesses and documents exchanged in discovery and the initial disclosures." *Id.* at 6. And Plaintiffs' initial disclosures included reference to "Employees and staff of Lucas County Children Services", which would include Parker and Fraber, although they are not identified by name. And defense counsel identifies emails from early 2024 entitled "Defendant's Supplemental Witness disclosures" that list several names under the subheading "LCCS Case Workers", and includes Parker and Fraber. *See* Doc. 119-1, at ¶ 4; *see also* Doc. 100-1, at 10-11. Defense counsel further states he became aware of Temple as a possible witness in March 2024, and again identified her as a witness in an email. *See* Doc. 119-1, at ¶ 5; *see also* Doc. 100-1, at 7. Victoria Hubbard's November 2023 deposition references Parker as "the investigating worker" for LCCS. (Doc. 102-1 at 216). Plaintiffs' depositions reference Temple throughout (*see* Docs. 103-1, and 104-1), and one Plaintiff responded to questions regarding interactions with Fraber (Doc. 104-1, at 134-35). And the documents on which Parker and Fraber's Affidavits are based (their Activity Log notes) were turned over to Plaintiffs in 2023. Further, Temple resided in the Haynes house at the same time as Plaintiffs and was mentioned repeatedly in their depositions. *See* Docs. 103, 104.

Plaintiffs contend the emails were "insufficient to comply with Rule 26(a)(1) because Defendants only provided names, withheld contact information for fact witnesses, and did not

summarize the subjects that these fact witnesses may have information regarding." (Doc. 120, at 3). They further contend the discovery responses were insufficient. At no time during the discovery period did Plaintiffs file a motion to compel or any other motion to dispute the adequacy or format of Defendants' disclosures. Thus, their complaints at this late juncture regarding an alleged "document dump" and not properly identifying responsive documents, ring fairly hollow. *Cf. DeLaval Inc. v. Hardy's Holsteins, LLC*, 2023 WL 6396574, at *8 (E.D. Mich.) ("[I]n any event, the Court declines to strike LaBean's declaration because Hardy never moved to compel DeLaval to serve its initial disclosures during discovery."); *FCA US LLC v. Bullock*, 446 F. Supp. 3d 201, 217 (E.D. Mich. 2020) (declining to strike a claim for damages where the moving party "fail[ed] to file a timely motion to compel during the discovery phase.").

The Court finds unpersuasive Plaintiffs' contention that they were unaware of the witnesses whose affidavits Defendants rely upon in support of their summary judgment motion. Even if the witnesses were not properly disclosed pursuant to Rule 26, the Court finds any violation harmless. *See* Fed. Civ. R. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). "[T]he burden is on the potentially sanctioned party to show harmlessness." *U.S. ex rel. Tenn. Valley Auth. v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 752 (6th Cir. 2016).

The Advisory Committee's comments identify, among other circumstances, that a situation in which a party omits disclosure of a name "of a potential witness known to all parties," or omits "to list as a trial witness a person so listed by another party," would be harmless. Fed. R. Civ. P. 37(c), advisory committee notes, 1993 amend. Along the same lines,

the supplementation provisions of Rule 26, which require updating of a Rule 26(a)(1) disclosure throughout a case, contain an exemption for information that has otherwise been made known to the opposing party during the discovery process. Fed. R. Civ. P. 26(e)(1)(A). The Sixth Circuit counsels a Court to consider five factors to evaluate harmlessness:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)). The Court has "broad discretion in applying these factors and need not apply each one rigidly." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) (internal quotation and citation omitted). "The factors simply lend themselves to the task at the heart of Rule 37(c)(1): separating 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Id.* (quoting *Bentley v. Highlands Hosp. Corp.*, 2016 WL 5867496, at *10 (E.D. Ky.)). The Court finds this case falls into the former, rather than the latter, category given Plaintiffs' awareness of these witnesses as set forth above. And there is "no binding authority for the proposition that Rule 26(e) requires . . . an explicit statement" that a party "intend[s] to rely on [a particular witness] and his records in moving for summary judgment." *Baker Hughes Inc. v. S&S Chem., LLC*, 836 F.3d 554, 568 (6th Cir. 2016). In *Baker Hughes*, the Sixth Circuit noted that the objecting party "had both (1) knowledge of Giles and his role in th[e] litigation, and (2) ample time to depose Giles or otherwise seek discovery with respect to Giles and his records. Any failure of Defendants to comply with Rule 26 was therefore a 'harmless' violation that did not require the district court to exclude the Giles-related documents." *Id.* at 568-69.

For these reasons, the Court denies Plaintiffs' Motion to Strike (Doc. 114).

15

*Motion to Conduct Additional Discovery*

Relatedly, Plaintiffs seek to conduct additional discovery, namely "discovery on Defendants' factual assertions set forth in their affidavits submitted in support of their Motion for Summary Judgment." (Doc. 115, at 5). Federal Civil Rule 56(d) provides:

> (d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>> (1) defer considering the motion or deny it;
>> (2) allow time to obtain affidavits or declarations or to take discovery; or
>> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The determination on a Rule 56(d) motion is within the district court's discretion. *In re Bayer Healthcare & Merial Ltd. Flea Control Prods. Mktg. & Sales Practices Litig.*, 752 F.3d 1065, 1074 (6th Cir. 2014). The Sixth Circuit has "cited approvingly other circuits' view that '[a] . . . motion requesting time for additional discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" *Doe v. City of Memphis*, 928 F.3d 481, 490-91 (6th Cir. 2019) (quoting *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 n.7 (6th Cir. 2014) (further internal quotations and citations omitted)) (alterations in original). There are five factors to consider in a Rule 56(d) motion:

> (1) when the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests.

*CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008) (quoting *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196-97 (6th Cir. 1995)) (the "*Plott* factors"). But the "main inquiry is whether the moving party was diligent in pursuing discovery." *Doe*, 928 F.3d at 491 (quoting *E.M.A. Nationwide, Inc.*, 767 F.3d at 623); *see also Wilson v. Ebony Constr. LLC*, 2018 WL 4743063, at

16

*5 (S.D. Ohio) ("[T]hree of the five *Plott* factors hinge on issues of timeliness and diligence," i.e., the first, third, and fourth factors.).

Here, the discovery period ran for ten months (September 2023 to June 2024), and the bulk of Defendants' documents were turned over early in that time period (September/October 2023). These documents are the ones which Defendants' motion and witness affidavits are based. Plaintiffs submitted their only written discovery requests a mere two weeks prior to the end of the discovery period.[7] And Plaintiffs did not raise any discovery dispute promptly upon receipt of Defendants' motion for summary judgment; instead, it was raised sixty-one days later, after seeking three extensions of time that did not reference any potential discovery-related issue, and not until the day after the opposition brief was filed. The Court finds the clear lack of diligence dictates no further discovery should be permitted. *See, e.g.*, *Marie v. Am. Red Cross*, 771 F.3d 344, 367 (6th Cir. 2014) (finding no abuse of discretion in denying motion to conduct additional discovery when plaintiff "waited nearly nine months to submit their initial discovery requests, which were served only a few weeks before the discovery deadline"); *Williams v. Schismenos*, 2017 U.S. Dist. LEXIS 38054, *12-13 (N.D. Ohio) ("Plaintiff also waited more than a month after discovery had closed and summary judgment was pending to allege a discovery dispute. This dilatory conduct weighs heavily against delaying this case any further.").

For these reasons, Plaintiff's Motion for Additional Discovery (Doc. 115) is denied.

---

7. The Court notes that pursuant to Local Civil Rule 16.1(b)(6), the discovery deadline "is that date by which all responses to written discovery shall be due . . . and by which all depositions shall be concluded. Counsel must initiate discovery requests and notice or subpoena depositions sufficiently in advance of the discovery cut-off date so as to comply with this rule, and discovery requests that seek responses or schedule depositions after the discovery cut-off are not enforceable except by order of the Court for good cause shown." By virtue of Federal Civil Rules 33(b)(2) and 34(b)(2)(A), parties have 30 days to respond to interrogatories and requests for production. Plaintiffs' written discovery requests put Defendants' responses due past the Court's discovery deadline. Nevertheless, Defendants responded within the 30-day time period permitted by the rules, despite the fact that it was past the deadline.

<u>Motion for Summary Judgment</u>

Defendants move for summary judgment on the remaining substantive due process claim, brought pursuant to 42 U.S.C. § 1983. (Doc. 109). They contend each Defendant is entitled to qualified immunity. Defendants moved for summary judgment as to the claims against each of them. In opposition, Plaintiffs contend there are genuine issues of material fact which prevent summary judgment on their claims against Von Sacken and Hickey. In a footnote, Plaintiffs state: "based on discovery to date, Defendants Mowery and West/Elkins did not take any affirmative act which removed Plaintiffs from their mother and placed them with the Hayneses." (Doc. 113, at 13 n.1). *Cf. Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 325 (6th Cir. 2023) ("When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited."). Because the Court has determined the Plaintiffs are not entitled to further discovery, and Plaintiffs concede that they have not identified an affirmative act, Defendants Mowery and West are entitled to summary judgment.

*Claims Against Von Sacken and Hickey*

Remaining are Plaintiffs' claims against Von Sacken and Hickey. At core, Plaintiffs assert Von Sacken and Hickey took actions that violated their substantive due process rights; their action (and alleged inaction) resulted in Plaintiffs being placed in the Haynes household where they were subsequently abused. Defendants contend Plaintiffs cannot establish a genuine issue of material fact regarding whether Von Sacken or Hickey violated Plaintiffs' clearly established constitutional rights.

The Fourteenth Amendment's Due Process Clause limits "the State's power to act." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). It "does not impose on the state an affirmative duty to protect individuals against private acts of violence."

*Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017) (citation omitted). Rather, "[i]ts purpose was to protect the people from the State, not to ensure that the State protected them from each other." *DeShaney*, 489 U.S. at 196. There are two exceptions to this maxim. One arises when the plaintiff is harmed while in state custody. *See Lipman v. Budish*, 974 F.3d 726, 741 (6th Cir. 2020). Exception two is the state-created-danger theory. It allows a plaintiff to hold the state responsible for harm caused by a third party if:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (citation omitted).

Plaintiffs argue there are genuine issues of material fact remaining on their due process claim pursuant to the state-created danger theory. The Court addresses each element below. As with all § 1983 actions, each defendant's liability "must be assessed individually based on his [or her] own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010); *see also Jones v. City of Elyria*, 947 F.3d 905, 913 (6th Cir. 2020) ("[Courts] do not lump together each of the relevant government actors. Rather, [they] assess each actor's liability on an individual basis.").

### Affirmative Act

"Whether conduct amounts to an 'affirmative act' in this context is at times a difficult question." *Engler*, 862 F.3d at 575. "[A] failure to act is not enough." *Lipman*, 974 F.3d at 744. The key "question is whether the individual 'was safer before the state action than . . . after it.'" *Jasinski v. Tyler*, 729 F.3d 531, 539 (6th Cir. 2013) (quoting *Cartwright*, 336 F.3d at 493).

Defendants seem to briefly contend Plaintiffs cannot satisfy this element because they "were initially in a home where the youngest child was starved and beaten by an unknown

assailant until his ribs and other bones were broken." (Doc. 109, at 16). But the Court rejects this argument and declines to find that it must weigh the physical abuse of one child against the placement of a different child in an environment involving sexual abuse to determine which is "safer". On the facts before the Court, Plaintiffs were certainly less safe from sexual abuse following their placement in the Haynes home. *Cf. R.S.*, 2022 WL 17730531, at *4 (stating, at the pleadings stage in the instant case: "Plaintiffs went from a neglectful (and in the baby's case, abusive) home to a living hell, which certainly meets the definition of an affirmative act.").

Plaintiffs contend that "Von Sacken and Hickey took actions which removed Plaintiffs from their home and placed them with the Haynes[es]." (Doc. 113, at 13 n.1). They cite Von Sacken's statement on the home study that the Hayneses were a low-risk placement and Hickey's participation in completing that home study as the "affirmative act" at issue. *Id.* at 14-17, 18-20. As the Sixth Circuit found, the action of recommending to the juvenile court that the children be removed and placed with the Hayneses is a sufficient affirmative act. *R.S.*, 2022 WL 17730531, at *4. As discussed below, discovery has changed the facts from what they were alleged to be at the pleadings stage (where it was alleged Von Sacken knew of substantiated sexual abuse allegations against the Hayneses but failed to investigate them). But the Court presumes at least *arguendo*, for purposes of proceeding through the remaining steps of the analysis, that taking actions to recommend placement can constitute the affirmative act necessary under the state created danger exception.

### Special Danger

Under the second prong, Plaintiffs must show each Defendant's actions "place[d] [them] specifically at risk, as distinguished from a risk that affects the public at large." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). The Sixth Circuit explained that "[t]his

element is met when 'the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims.'" *R.S.*, 2022 WL 17730531, at *5 (citing *Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006)). At the pleadings stage, the Sixth Circuit found this element satisfied because "Plaintiffs' complaint plausibly alleges a special danger because only R.S., T.H., and their siblings were subject to Von Sacken's placement recommendation." *Id.* The same is true here – Von Sacken, and subsequently Hickey, conducted the home study upon which Plaintiffs' placement with the Hayneses was at least partially based.

### Deliberate Indifference

Defendants ultimately contend they are entitled to qualified immunity and therefore summary judgment because Plaintiffs have not established that either Von Sacken or Hickey acted with deliberate indifference. The Court agrees that Plaintiffs' claims falter at the third prong of the state-created danger exception in light of the evidence presented.

Under the third prong, Plaintiffs must show each Defendant acted with the requisite culpability to establish a constitutional violation. *See Arledge v. Franklin Cnty.*, 509 F.3d 258, 263 (6th Cir. 2007). Plaintiffs must show that each Defendant "knew or should have known that [her] actions specifically endangered the plaintiff." *Cartwright*, 336 F.3d at 493. The Sixth Circuit has equated deliberate indifference with subjective recklessness, meaning "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006) (quoting *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 493 (6th Cir. 2002)). Subjective recklessness can "be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003).

Moreover, the qualified immunity doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is an affirmative defense; once a defendant raises it, the burden shifts to the plaintiff to demonstrate: (1) the defendant's acts violated a constitutional right, and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). A "clearly established right", for the purpose of determining whether a public official is entitled to qualified immunity, "is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). "For a right to be clearly established, 'existing *precedent* must have placed the statutory or constitutional question beyond debate.'" *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022) (emphasis in original) (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021)). "The plaintiff bears the burden of showing that the right was clearly established" and, to meet such a burden, "must provide on-point caselaw that would bind a panel of [the Sixth Circuit]." *Bell*, 37 F.4th at 367-68.

Defendants here contend they are entitled to qualified immunity because Plaintiffs cannot establish the mental state required – deliberate indifference – for a state-created danger claim. Plaintiffs respond that "Von Sacken had information in the SACWIS report contained in the home study for the placement of [Plaintiffs] which showed that the Hayneses had a history which

22

involved abuse cases" and "also should have known that Lisa Haynes had previously been convicted of identity fraud under R.C. 2913.49, which can be a disqualifying conviction for adults seeking to have children placed with them." (Doc. 113, at 17-18). They argue similarly as to Hickey: "Like Von Sacken, Hickey had information in the SACWIS report which showed that the Hayneses had a history involving abuse cases. Hickey also should have known about Lisa Haynes'[s] prior convictions and jail sentences. Hickey also should have known that putting the children with the Hayneses would place them in danger." *Id.* at 20. Thus, Plaintiffs rely solely on the SACWIS records and Alisa Haynes's prior conviction on this prong. The Court addresses each below.

*SACWIS Records*

Defendants contend Plaintiffs have pointed to no clearly established case law to show either Von Sacken or Hickey acted with deliberate indifference in taking actions which resulted in their placement with the Hayneses, where a records check in SACWIS revealed only abuse or neglect claims previously determined to be unsubstantiated or, where substantiated, the individuals were not listed as the alleged perpetrator.

Again, to establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *McQueen*, 433 F.3d at 469 (quoting *Sperle*, 297 F.3d at 493).

In contrast to the record at the pleadings stage, the developed discovery record demonstrates it is undisputed that the SACWIS system at the time of Plaintiffs' placement contained no substantiated abuse or neglect allegations where Alisa Haynes was the alleged perpetrator. And although it contained one record in which Anthony Haynes was identified as the alleged perpetrator of sexual abuse, that claim was found to be unsubstantiated. That is, there

were no claims of abuse against Alisa Haynes, and the only claim against Anthony had been determined to be unsubstantiated. *See* Docs. 109-11 (Alisa), 109-10 (Anthony). The record reflects that Von Sacken reviewed those prior allegations as part of her preliminary home study. (Doc. 106-1, at 75-82, 129-32). Plaintiffs seemingly argue Von Sacken (and Hickey) should have done more: "Von Sacken and . . . Hickey had this information available to them when they created the home safety plan for the children in July 2014. They never followed up on any of this information to find out what the circumstances of the entries were for Lisa Haynes or Anthony Haynes." (Doc. 113, at 2-3) (citing "Summary of Referrals" section of home study). Plaintiffs provide no citations for these factual assertions in their brief. And Von Sacken explicitly testified that she "read . . . what is contained in the intake and then reviewed . . . the narrative when the case was finalized" (Doc. 106-1, at 106), and "reviewed the allegations, reviewed the dispositions and what happened in the case", *id.* at 129.

It is worth reiterating that deliberate indifference requires a showing that the individual is (1) "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists", and (2) "also dr[e]w that inference". *McQueen*, 433 F.3d at 469. Here, the undisputed evidence reflects that Von Sacken reviewed the allegations in SACWIS and determined there were no substantiated allegations as determined by prior investigations. (Doc. 106-1, at 77-82, 132). It also reflects that Hickey reviewed the information on the completed home study "but nothing must have stood out to [her]." (Doc. 107-1, at 35). Although Plaintiffs have demonstrated that allegations of abuse had been made against Anthony Haynes prior to their placement, they have not demonstrated that being aware of abuse allegations that were investigated and determined to be unsubstantiated, or records on which an individual was not the alleged perpetrator of abuse were "facts from which the inference could be drawn that a

24

substantial risk of serious harm exists". *McQueen*, 433 F.3d at 469. Further, even if they had, they have certainly not provided facts from which a jury could conclude that either Von Sacken or Hickey "dr[e]w the inference". *Id.* Nor have Plaintiffs presented facts from which a jury could conclude that it was subjectively reckless to rely on these previous investigatory determinations. It is tragic that the risk identified in the abuse report determined by previous investigators to be unsubstantiated is precisely the harm ultimately inflicted upon Plaintiffs. But the benefit of hindsight does not demonstrate that either Von Sacken or Hickey acted with deliberate indifference. For these reasons, the Court finds Plaintiffs have not demonstrated a question of material fact regarding Defendants' deliberate indifference as it relates to the SACWIS records.

*Prior Convictions*

In their opposition brief, Plaintiffs paste the two records described in the above background section, which contain references to Alisa Haynes serving jail time, then contend:

> Neither Rebecca Von Sacken nor Sue Hickey reviewed this information, which would have alerted them to Lisa Haynes' previous convictions in 2000 for attempted identity theft, attempted misuse of a credit card, and attempted forgery. *See* Lucas County Common Pleas Case No. G-48010CR0200002865-000. Notably, Lisa Haynes' conviction in 2000 under R.C. 2913.49 (identity fraud) could have disqualified her from allowing Plaintiffs to be placed with her. LCCS would have had to review her conviction and probation. Lisa Haynes' probation for that conviction had been terminated unsuccessfully after she had been in jail in 2004 and again in 2006 for violating the terms of her probation. Lisa Haynes had not successfully completed her probation for these offenses, yet Plaintiffs were placed in her home. Neither Von Sacken no[r] Hickey obtained or reviewed this information before placing the children with the Hayneses, even though it was readily available to them.

(Doc. 113, at 5-6). Other than the included case citation, Plaintiffs' brief provides no other citations for the statements in the above-quoted paragraph. The Court notes that Plaintiffs' counsel asked no questions of either Von Sacken or Hickey at their depositions regarding these records or these now-cited specific prior convictions. Von Sacken testified a criminal history was

25

run and there were no disqualifying convictions (Doc. 106-1, at 73-75, 109-13, 130-31), and Ryan Parker avers that he was instructed by his supervisor "to ensure criminal records checks were completed" and he "found the records checks with no disqualifying history" (Doc. 109-2, at ¶ 9).[8] Further, at the time Plaintiffs were placed with the Hayneses, they were already caring for another child with LCCS approval. *Id.* And although Plaintiffs assert the cited conviction "could have disqualified her", they point the Court to nothing from which to assess the accuracy of that statement. Defendants respond that the conviction was not disqualifying.

Resolving the question of whether Alisa Haynes's convictions from the year 2000 were disqualifying is not necessary. Even assuming the convictions were disqualifying, and that Von Sacken or Hickey should have known about it and did not, such a failure does not rise to the level of deliberate indifference in the present context; Plaintiffs have pointed to no clearly established law suggesting it does.

Deliberate indifference is a high bar—one that surpasses mere negligence. *Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020). "[O]nly extreme misconduct"—conduct that shocks the conscience—"will violate the [Due Process] clause." *Id.* at 933. Plaintiffs' argument appears to conflate the affirmative act prong with the deliberate indifference prong. That is, taken to its logical conclusion, Plaintiffs' argument is that if Von Sacken and Hickey had properly identified that Alisa Haynes had a disqualifying criminal conviction, they would not have been placed with the Hayneses and would not have suffered as they did. But this is not the standard. Rather, the Sixth Circuit has explained, the standard "has two parts":

---

8. Defendants also submit, in conjunction with their motion for summary judgment, criminal history records checks from September 2014 that indicate no records for either Anthony or Alisa Haynes (identified as "Lisa Haynes"). (Doc. 109-18).

> An official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Ewolski*, 287 F.3d at 513 (quoting *Farmer*, 511 U.S. at 837). "Having drawn the inference," the official next must "act or fail to act in a manner demonstrating 'reckless or callous indifference' toward the individual's rights." *Id.* (citation omitted). Given the call for caution in this area, *Collins*, 503 U.S. at 125, our cases set demanding rules for both parts of this standard.

*Id.* at 933. As to the first part, to "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," "a public official must know of more than a *general* risk of harm. The official must know of the *specific* risk that later develops." *Id.* at 933-34 (quotation omitted) (emphasis in original). Here, even if it is somehow enough that Von Sacken and Hickey should have known of the prior convictions (or did know, although Plaintiffs have presented no evidence that they did), there is nothing to suggest that such a conviction would support an inference that there was a substantial risk of the specific harm suffered here, child abuse. *Cf. McQueen*, 433 F.3d at 469-70 (finding a teacher's knowledge of a student's "sometimes violent behavior" was not enough to prove that she knew that student posed a risk of gun violence).

The Court therefore finds Defendants have established their entitlement to summary judgment on the 42 U.S.C. § 1983 substantive due process claim against Von Sacken and Hickey.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiffs' Motion to Strike (Doc. 114) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Plaintiffs' Motion to Conduct Additional Discovery (Doc. 115) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. 109) be, and the same hereby is, GRANTED.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: March 27, 2025